Ms. Opria. Good morning, may it please the court. My name is Karen Opria and I'm representing Lionel Alexander, the plaintiff. This is a section 1983 civil rights case and we're here on the grant of a motion to dismiss. If I could, I'd like to start by discussing the initial detention of Mr. Alexander and whether there was reasonable suspicion to stop him. And in doing that, I would like to touch on the U.S. v. Montevallis case that was released last week because it does discuss some relevant principles having to do with the right to walk away from a police presence versus the concept of headlong flight. It's clearly established that voluntary interactions with police officers are truly voluntary. And what the Supreme Court has said about that is that means that you can decline to have them. Even if an officer walks up to you, you can walk away. Or if an officer asks you questions, you can decline to even listen to them and walk away. Every reasonable officer would have known that at the time of this incident. And every reasonable officer would know that something more than just departing from the presence of police would be required to view that act as fleeing. Mr. Alexander alleges that he did not flee, he did not speed away, he did not run away. He happened to be getting back into his car when there was a patrol car nearby in the parking lot. I think that the Montevallis case was a little tougher than Mr. Alexander's case. Mr. Alexander's situation is easier for a couple of reasons. The first is that in Montevallis, there was a motorist who was stranded and he was walking down a freeway alone in the middle of the country. And the officer actually pulled up in front of him and approached him to rescue him. And he just walked right past the police car. So he made a deliberate decision, I'm not going to get help from the police. In Mr. Alexander's case, Officer Garza had not approached him and attempted to have a consensual or voluntary interaction at all. He alleges that he turned around and got back into his car. As he was doing that, he became in a position where he could notice that there was a patrol car nearby. And then he just continued doing the same thing that he was already doing, getting into his car and driving away. So just go through in segments, you've according to Mr. Alexander's pleadings. He was returning to the hotel and he saw a cat and wanted to feed it. So he parked his car in a different parking spot than his normal spot because of the cat. So he got out of the car and he, the cat had run into a grassy area in the hotel. And so he walked next to his car and was standing there looking. And while he was doing that. How close to his car, if the record shows, was he at that point? He was. If it's not in the record, don't tell us. OK, that's fine. But he was standing there looking at the grass, not for very long, just long enough to see that the cat had run away. And during that time when he was looking, Officer Garza had pulled into the parking lot. And so when he turned around, he just noticed, kind of in passing, that there was a car nearby him. But it didn't have his lights on. Officer Garza wasn't trying to approach him or making any, he had no reason to think that he wanted to talk to him. And so he thought, well, I'm just going to keep doing what I was already doing. I'm going to move my car to a spot closer to my room. And so he started to drive. And then Officer Garza turned on his lights and initiated a detention of Mr. Alexander. So our contention is, you know, does the record show? And again, if it doesn't, don't tell us how far he drove his car before he was stopped. I don't say we don't plead exactly how long. All right, that's fine. OK. So we're looking to the initial detention that, you know, first prong of the asking that information that Officer Garza had at that moment, from the perspective of a reasonable officer, would he believe that there was reasonable suspicion that Mr. Alexander was involved in some kind of criminal activity? And, you know, we have a person in a hotel parking lot, which is not an unusual place to be. What if he had been, I know it's not the facts of this case, but what if it had been a situation in which the officer thought perhaps this is a person who needs some help, maybe of some sort? Would he be OK in turning on his lights and stopping to ask? Well, I think there is a community caretaking exception that's sort of related to Terry. I don't think it's implicated here. And I don't know what the standard is there for community caretaking stops. But I don't think it's implicated by these facts. And I think in Montsevier's, they decided that there was no detention by virtue of the officer initiating his lights to help this man, that it was just a voluntary interaction. So suspicion of crime is what's involved in the case. That's this is a suspicion of crime. Yes. And I did want to address the Montsevier's dissent because I think that the dissent would probably agree with Mr. Alexander's position. The dissent was saying, not calling into question this law about walking away from the police or headlong flight, but I think what the dissent is saying is this person on the side of the freeway needs to be rescued. They're in a special, desperate situation. There's no one to help them. They're going to walk for who knows how long in the country and the sun's going down. And so the person needs to be rescued from this circumstance. That's suspicious. Mr. Alexander isn't in that circumstance at all. He's in a hotel parking lot and he just wanted to go back to his room. So that's another way that I think the Montsevier's case was a little tougher to decide. And I think the dissent would agree here with Mr. Alexander's position. And Montsevier's talks more broadly about this concept of articulable suspicion and what does it mean to observe something and then get to that place where you're at. It's objective and I can articulate why I think something is criminal, rather than just makes me curious. And here we have a person standing by a parked car in a hotel parking lot. And it's 9.15 p.m. That's not an unusual time to be in the parking lot. I think Officer Garza was curious as to what a case like Brown v. Texas, and I think that clearly establishes that you need more than just an observation, a momentary observation of something that makes you curious in order to arrive at reasonable suspicion. I did also want to discuss the false arrest claim here. The Texas resisting arrest statute requires the use of force against an officer or another. That's written into the plain language of the statute itself. And it's also for decades been interpreted by Texas courts as requiring actual force. And the courts have been explicit that passive lack of cooperation with an arrest does not constitute resisting because the an officer or another. And we're at the motion to dismiss phase. We must take Mr. Alexander's allegations as true here. He alleges no force. He alleges that he did not resist. He alleges that he remained passive when the officers were touching his body. Those allegations, if proven true, mean that no reasonable officer could think force was used. I think that it's beyond debate that a reasonable officer couldn't believe a completely passive subject had used force against another person. How did they get him out of the car? They grabbed him and then forced him onto the ground. And he alleges that he felt at least three officers on him. There was a boot in his neck, pinning his face down into the concrete. Were his hands on the windshield, on the steering wheel? He'd been instructed to put his hands up on the steering wheel. Was he holding onto the steering wheel while they were trying to get him out? He was just to have them up there and just, they just pulled him out. You know, I'd like to note that this traffic stop, he pulled over to the show of authority. He gave his driver's license over. He put his hands on the steering wheel and kept them there. And, you know, moving to the excessive force claim, the, I think DeVille versus Mercantile talks about a situation more extreme than this, but does clearly establish that when you have a non-threatening subject who is, you know, not showing a risk of escape or of safety risk and is showing at most passive resistance, that you can't escalate without more than a little bit of negotiation. And that's what Mr. Alexander is alleging happened. He says that during the stop, he exercised his Fifth Amendment right to remain silent and that Officer Garza thought that that made him a dangerous person because he, Officer Garza had beliefs about people who exercise and rely on their constitutional rights being a member of this quasi-terrorist group and that he thought he was dangerous because of that. But that is all that had happened before he called back up in and Officer Garza said, asked him to step out of the car. And Mr. Alexander said, why? And Officer Garza said, because I asked you to. And then Mr. Alexander started to try to say something. And what do you think? Kennedy, let me ask you about that. Both — thank you, both sides, at least the government sides of the Supreme Court case Mims, in which the Court held it was minimal or inconsequential invasion of any privacy interest in a traffic stop to require the driver to get out of the car, that you don't have a constitutional right to stay in the car if the person asked to get out. Is that applicable here? I think that if the stop was lawful, then Officer Garza had the right to ask him out of the car under Pennsylvania v. Mims. And, of course, as you know, we are arguing it wasn't lawful. But I think that the — for the excessive force claim, I think the question is what was the interaction, not really whether or not he had the right to ask him out, but how quickly did the officer resort to force? How quickly did he escalate the situation to a forcible, violent situation? He had a very, very brief exchange with Mr. Alexander. Mr. Alexander thought that what was — and I'm not saying that this is Pennsylvania Mims lawful, but what he thought was, you're asking me, this is like asking if you can search my car. He thought it was a yes or no question. And he had a momentary effort at trying to clarify. He just said, why? He said, because I asked you to. And he started saying, but I thought — and then he gets yanked out of the car. This is the kind of immediate resort without any negotiation or explanation or effort to explain that Officer Garza was telling him to get out. And I think if you look to the DeVille case, you can see that this was a clearly established principle of how to deal with a driver whom you want to have exit. I do think that the fact that the stop was unlawful could play into the excessive force factors in some way. But ultimately, it's how quickly did you resort to using force when you are having a very, very brief exchange with a subject who is not threatening, has obeyed every order, and doesn't pose a risk of escape. So, you know, I think that analysis — under that analysis, qualified immunity should be denied. Thank you. All right. Thank you, Ms. Oprion. Mr. Thompson? You saved time for rebuttal, Ms. Oprion. May it please the Court, my name is Mike Thompson, Jr. I'm from Austin, Texas. And it's my honor today to represent Officer Marciano Garza, Sergeant Greg Brunson, Sergeant Samson Connell, and Officer Tracy Staggs in this appeal. My clients together have over 50 years of law enforcement experience between them. Officer Garza himself has 12 years. So would you mind going over the sequence of events that Ms. Oprion had given us this morning in terms of a motion that we take the facts as presented, but tell us what your side is. I will, Your Honor. In the present case, Officer Garza, we believe, developed reasonable suspicion based upon his perspective when he drove into the parking lot of this hotel on the IH35 corridor in Round Rock, Texas. Well, again, I need to be more precise. I don't mean to interrupt you, but I think you need to go through the sequence of events of what you say happened on the scene. Was he looking at a cat? Was he looking at a grassy area? Was he near his car? I mean, what are your allegations as to the raw material facts? Officer Garza turns into the parking lot. He sees a man standing in the parking lot, peering into the grass. He sees that man and it's at night. He's standing alone. He doesn't believe that there's any reason for him, you know, it's unusual, he believes, for him to be there. It draws his attention to him. He continues to drive, and then that man turns around, and from Officer Garza's perspective, he sees the police car and changes his conduct to go get in his car and drive away. Officer Garza had a reasonable belief at that point. Up to that point, you're moving from facts to conclusions. Up to that point, it sounds like your recitation of the facts are identical to what Ms. O'Priest said. Is that fair? The one, I think, difference would be that Officer Garza's perspective is that the man changed his conduct from seeing him. And I believe their position is that he was just walking back to the car. And that, I think, is the difference between that part of the case. So according to Officer Garza, as you're telling us, he was going to do something different had he not seen the officer and or the car? That's his, that was his belief. He changed his conduct based on seeing. But what would his conduct have been, according to what the officer thought? Well, he didn't know if the man was casing police cars in the parking lot. He wasn't sure. He just saw him. It drew his attention to him. And when he saw him, it appeared to him that the man saw his marked police car, changed his conduct by going back to his car and driving off. And that was what tipped him that he wanted to stop him and appearing into the grass. Is there anything in the record to indicate either from your side or theirs how fast or fervently or not fast or fervently he drove away? There is not. And there's not any fact in the record as to how far he went. And so the next step is Officer Garza initiated. Let's stop there, if I might, without interrupting Judge Smith's question. Well, I am interrupting it. What is your best case to support that initial stop? The initial stop? Well, I think Terry itself, but we've been Well, let's get a little bit more specific. Terry is awful general. Just seeing somebody, don't know at all what he's up to, the officer at this stage we can accept reasonably thought he changed his conduct, but you don't know what he's changing it from to get in his car and drive away. What's your best case beyond Terry that there's enough basis there to stop? Well, I think Illinois versus Wardlow. In the Supreme Court case, Officer Nolan in that case, they were on a patrol in the streets of downtown Chicago, a high crime area. Officer Nolan sees Mr. Wardlow next to a building holding a bag. He turns around, sees the officer, and he leaves. And the officer follows him. And the Supreme Court said that that was enough for a Terry stop, that the act of him changing his conduct, evading the police officers was enough. I also believe that this was not a high crime area. At least there's nothing in the record to indicate. I mean, if you noticed, obviously, in the dissent in Monsivais, Judge Jones referred to our in-bank case in Micheletti, but Micheletti relied heavily on the fact that it was a high crime area, and this was not in your case. The record is not clear on that. The judge determined that it was a high crime area. The magistrate made a recommendation that it was a high crime area, and the district judge agreed with him. There's nothing in the pleadings about that. Okay. So you're saying Judge Sparks just took judicial notice of the fact that this was a high crime area in Round Rock? Well, the magistrate mentions that it was a high crime area. But there's nothing in the record to support that? Well, he's been a U.S. magistrate for a number of years. He can't just do that just because Austin is near Round Rock, just to say that he thinks it's a high crime area? I'm just relating, Your Honor, what he said. Okay. So that could have infected the entire decision, I assume. Well, I don't think so, because even without that, I believe that there are enough objective facts that Officer Garza had a reasonable belief to do what he did, to investigate, try to figure out what was going on under the circumstances. And I think Terry, to go back to Judge Southwick's question, Terry, I know it's the big case, but if you look at the facts of that case from the outset, you see that Detective McFadden, what he did was he saw two men on the street walking around. That's all that drew him to start watching them, based on his training and experience. And then he watched them some more, and he came to a belief that it was his duty as a police officer to investigate. And Judge Warren looked at that in the Terry case, and he said, you know, it would have been poor police work if McFadden had not gone over there and investigated what was going on, and that's what he did. And he went over there and he talked to those men, and they did nothing to, you know, to end his suspicions. They mumbled something, and, you know, Earl Judge Warren said, that's reasonable suspicion. He had suspicion to do that. It would have been poor work, police work, if he hadn't done that. And back to Mitchell. Kennedy, it's bound to be some distinction, and you're more recently familiar with the facts of Terry than I am, but it seems to me in my recollection in your recitation that they watched for a while and saw a continuation of either casing out some stores or something that made them suspicious. Here we have a few seconds of somebody looking off into the grass. I forget what word your friend on the other side used. There's a difference, though, between curiosity and suspicion, and I'm not sure if that line was crossed here. Obviously, our position is that it was, and we believe the judge correctly so found. But again, McFadden and Terry did have more time to observe the men going back and forth. There is no doubt. My client, Officer Garza, did not have the luxury of that time. But in Illinois v. Wardlow, Officer Norton didn't have but a few seconds to see the man flee, and he was found to have reasonable suspicion for him in that case. And back to Micheletti, it was a high-crime area. But again, the act of changing your conduct upon seeing the police officer come is a factor that can be considered in reasonable suspicion. Where else, Dr. Kennedy? Well, of course, in Micheletti, you had the defendant after the bar, it closed after drinking hours at 2 a.m., and after that, you know, kicking open a screen door at the back of the bar with a — he may have had a drink in his hand, I'm not sure, but obviously trying to escape the premises once the officers had arrived. That was a much more suspicious situation. I mean, I just said it. I still didn't think it was a legitimate stop, but the majority of our Court disagreed with that. My understanding in that case was that a large part of the problem was that the men who fled were not Micheletti, and it was transferring the knowledge of watching those men flee to do the Terry stop and frisk of Micheletti. Here we don't have that issue because Officer Garza, he's the person who saw Alexander engage in this conduct, and that conduct is what led him to make his stop, believing that he needed to investigate what was going on in that parking lot at that moment in time. Does the record show how long the passenger time was from when Mr. Alexander was asked to get out of the car until he was grabbed by the other officers? The record is not — there is no time in that — in the record. The record on that is that Officer Garza completes his stop. He gets out of the car. He walks up to talk to Mr. Alexander, gets his license, tells him, please keep your hands on the steering wheel, and he tries to ask him questions just like McFadden did in Terry, and he says, I'm not going to answer any questions. Officer Garza backs up, calls for backup, and waits until backup gets there. Now, what's not clear in the pleadings, which is all we're on in this case at this point, is what happened during the period of time he was waiting for backup to get there. Their pleadings suggest that there was some continuing conversations between Garza and Mr. Alexander in the car, but the pleadings are silent to what those conversations were or how long they were. And so, you know, the next thing that happened, of course, is that when the officers, when his backup officers get there, Officer Garza — excuse me — he goes to the car, and tells Mr. Alexander, you know, you need to get out of the car. And Mr. Alexander says, why? And the officer says, because I asked you to. There's no disagreement in the record about that. And then he says, starts having a legal debate with the officer about, well, you know, do I have to get out of the car? Why do I have to get out of the car? And the officer, we believe, with the authority of Pennsylvania v. Mims, acted to take him out of the car. He had an absolute right at that point under the Fourth Amendment to do that. And then, when he didn't get out of the car, he was in violation of the lawful order and interfering with the duties of an officer, and he was subject to arrest. And I would encourage the Court to review the recent case of Ballou v. Zoss — I'm The stop — a DWI stop in Round Rock, Texas, of a man who would not get out of his car, and the officers asked him to get out of the car and — Well, the facts in Brothers were very different from this. That was a guy who had been misbehaving inside the — inside the — I believe it was a topless club. It was a bar anyway. And he was obviously being belligerent, and he had already gotten into his great big oversized truck and had started the engine and posed a danger had he tried to move the truck, even though there were other vehicles next to him. He could have caused some — some damage or some — or some — or some injury. And the — and the guy was obviously, as you said, impaired, intoxicated, and — and also had, because he was morbidly obese, had — there were some physical issues with — with getting him out of the — out of the truck. I mean, I don't know how you can — I mean, it's fair for you to cite the Brothers case, but it just seems to me that the facts there were so completely different. Well, undeniably, that was a traffic stop and arrest for DWI. More aggravated facts, no doubt. I cite it for the point that an officer in a stop under Pennsylvania v. MIMS has an unquestioned ability under the Fourth Amendment to remove a person from the car to complete his investigation, his Terry stop, as it were, for officer safety, as well as the safety of the — the people in the car. I mean, that's the Fourth Amendment under — under Pennsylvania v. MIMS. Well, let me read the footnote to you from Pennsylvania v. MIMS. We have a Terry stop here. Would you agree? Yes, sir. And this was an actual traffic violation in MIMS. And in responding to the sent, the Court said, we hold only that once a motor vehicle has been lawfully detained for a traffic violation, the driver can be asked to get out of the car. So your trend — I mean, first, we've got to have a valid Terry stop, but that is sort of the game anyway. So if we don't have that, we certainly don't have MIMS, but I wonder if we even have MIMS if it's just a Terry stop and not a — I mean, all we have here is suspicion. The violation in MIMS was a traffic violation of some sort. I don't know what it was, speeding or an inch over the center line or whatever it is that caused the officers to stop. So as a distinction, you want to make any — you want to tell me why it's not a meaningful distinction? Again, the officer safety component, when you — when they make that stop in a traffic stop, you have the same considerations if it's a Terry stop on wheels, so to speak. A Terry stop is the reason for the stop. It's still about officer safety. It's still about getting the person out of the car so that they can observe them while they're doing their investigation. So it does apply, we believe, in this setting. Do you disagree that resisting arrest in Texas requires a use of force by the defendant? We think properly understood that is correct, but we believe that there was resisting in this case based on the fact that the suspect, Mr. Alexander, he did not get out of the car and was using the car as force to prevent the search. But my question had to do with use of force. I mean, he may have — he may have refused, but did he use force against the officer? We believe so, yes, Your Honor. What was that force? Again, he kept his hands on the wheel. He did not get out of the car. He kept his hands on the wheel as he had been told to in the usual 10 o'clock, 2 o'clock position. Is that right? Yes, sir. And then the officer told him to get out of the car. How can that — I just don't understand how that can be use of force. Again, under 38.03 in the case of Finley v. State, we believe that it can be. But beyond that — Where's the force? Where's the force? Opposing counsel said he wasn't holding on to the wheel. He just had his hands up there. Where's the force? Again, we believe that not getting out of the car is itself using the car as a force. But sensing the court's — Do you have any case that ever held that, sitting in your car as a force? Well, the Finley v. State case is not that situation. It's about pulling your hand back from an officer. And we believe that this is similar to that by not getting out of the car. But I understand — I sense the court's discomfort with that. And Judge Sparks, he talked about that. But he also said that there was probable cause for resisting the order to get out of the car itself. And there's a different statute that Officer Garza had probable cause for interfering with the duties of a peace officer. And we believe, even under the Fourth Amendment itself, under Pennsylvania v. Mims, he had the authority to ask the man to get out of the car for officer safety reasons. He was arrested for resisting a search. Is that right? He was. But we believe that if there's probable — His person or the glove compartment or the car, what was the search? I'm sorry? Resisting a search of what? His person or the car? His person. And, you know, we believe that if there's probable cause for any related offense, criminal offense, that there's a — it's not a wrongful arrest claim because the officer had arguable probable cause for making the arrest. I'm running out of time. I wanted to talk about the case that you guys asked us about, Montsevice. And I would rely primarily on the fact that in Montsevice, you know, that was a consensual stop. It was a welfare stop. Our case, we agree, it was a Terry stop. And so there are some differences in that situation. And we've talked about what Officer Garza saw and how he reacted to it. The case doesn't help you any, though, does it? I think the case does help us, Your Honor. It does help us? Yep. In that, you know, that — that's a — it's not a Terry stop. It's a purely consensual situation. And I think the dissent is — is right on as far as considering officer safety. I don't know how you can say that an officer who does a welfare check or a mental health check for the — or for the person who they're called on or they come into that needs assistance cannot consider the totality of the circumstances while he's there in evaluating the idea of his danger to him. I'm running out of time. So on the use of force, the Fourth Amendment, we believe that the officer had the right to ask him to get out of the car, and they used reasonable force to do so based on the totality of the circumstances they faced. You've been asked a lot of questions, and you can have an extra minute if there's some other — if there's something else that you haven't been able to cover. I appreciate that, Your Honor. The one point that — a couple of points that I did want to make is the retaliation claim. Judge Sparks dismissed the retaliation claim. We believe he did so appropriately. You know, if there was a reasonable suspicion and — and or probable cause, there cannot be a retaliation claim. And we'd cite for the Court, and we have in our brief, Allen v. Cisneros. And then I would just remind the Court, you know, this is a qualified immunity case, and the cost of living together in community is ordered liberty, and part of that is qualified immunity. It's not judicial immunity. It's not immunity for prosecutors or witnesses. But it is an important public policy. As the Supreme Court said, qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. We believe he hasn't met — Alexander hasn't met that in his pleadings, and the officers at the very least are entitled to qualified immunity. Now, I focused on Officer Garza, but I would say that the other officers, the pleadings do not identify specific — specifically detail the conduct of the other officers that might lead to a constitutional violation. And under Cass v. the City of Abilene and Meeters v. Ermel, they must do that. They haven't, so at the very least, those officers should be out also. And the City, of course, they were dismissed, and that was not appealed. We believe Pennsylvania v. Mims is critical in this case. Officers are placed in extremely dangerous situations, and if, please, exit the vehicle authority is ignored in the streets or undermined in the courts, it will affect officer safety. And, of course, placing officer safety at risk ends up creating more risks for everyone involved, because nervous officers without visibility of potential threats are sometimes forced to make judgments and act more aggressively than officers with more complete information. All right. Your time has expired now, Mr. Thompson. Thank you, Your Honor. Thank you. Ms. O'Keefe, you've saved time for rebuttal. If I could, I noticed that opposing counsel did bring up a couple of new statutes in the letter on Tuesday in this argument, statutes that he's arguing support probable cause for arrest. They weren't brought to the trial court's attention and not raised in the response brief. I believe those questions are raised for the — waived for the purposes of this appeal. And if the Court does disagree with that, I would ask for the opportunity to provide some supplemental briefing, because it is the first time we've heard. You can give us a two-page letter on that. Okay. No more than two pages, and Mr. Thompson can respond in two pages if he wishes. Okay. On the interference with public duties. Okay. Thank you. I appreciate that. And then I want to talk about MIMS. I don't know that MIMS is as dispositive. I don't know if that's really the question here. If the stop is lawful, the officer can ask somebody out of the car. But the question is, was the resort to force reasonable? MIMS isn't really talking about force, and MIMS isn't authorizing the delay of a stop in order to ask someone out of a car. So I think MIMS isn't necessarily what this hinges on. I think the question is, was there an escalation that was unnecessary or unreasonable? And I wanted to touch on the discussion of Wardlow, the Wardlow case as well. I believe the distinction in the law is not did someone change their behavior because the police were nearby or not. I think that Florida v. Bostic and Florida v. Royer established that you certainly can change your behavior because the police are nearby. You can actually be approached by an officer and look them in the eyes and turn around and walk away because you don't want to have a voluntary interaction. So — Well, Wardlow, helpfully to you, Wardlow establishes the right to go about your own business. Right. So Wardlow, I think, is supporting that as well. And the Wardlow court, I think, is saying there's something that's the opposite of just choosing not to be around the police. It's called headlong flight. And that's the question. Could a reasonable officer think that headlong flight is taking place? Mr. Alexander didn't engage in flight. It's not in his allegations. He just drove away as he would have normally. And I do agree with the Montsevais court that whenever you have headlong flight cases, you have other contextual considerations in addition to fleeing, such as in Wardlow, you had officers converging on an area doing essentially a drug bust. And so when they see a man look at them holding an opaque bag and take off running, well, that's reasonable to think that he's involved in crime. But — What's your position on the allegation that sitting in the car or using the car was forced by Mr. Alexander? I think that is not supported by the case law at all. In fact, I cite a case called Sheehan v. State, where a man is approached by officers who say, I'm replacing you under arrest, you have to come with us. And he backs up and folds his arm against his chest, and he goes into kind of a tough spot in the room where they can't get to him. And the court says that's not resisting because he's just — he's just avoiding arrest. You know, he's just backing away. The idea is violence or physical aggression. That's what the courts talk about. And the Court of Criminal Appeals of Texas actually ruled on a case called Dobbs that a man holding a gun to his own head wasn't violating the statute because he didn't point it at the officer. So I think the case law is really crystal clear on that issue. If there's no more questions — All right. Thank you. Thank you very much. Your case is under submission, Ms. Oprah.